IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:15CR381 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW J. KING, | ) | **GOVERNMENT'S TRIAL BRIEF** |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through counsel, Carole S. Rendon, Acting United States Attorney, Michelle M. Baeppler and Margaret A. Sweeney, Assistant United States Attorneys, respectfully submits the following Trial Brief.

**I.      FRYE INQUIRY**

Ordinarily, the United States would request that the Court inquire, before trial, whether defense counsel has communicated to Defendant and whether Defendant has rejected, a pretrial plea offer made by the United States in accordance with Missouri v. Frye, ___ U.S. ___, 132 S.Ct. 1399 (2012). In Frye, the Court considered an ineffective assistance of counsel claim by a defendant whose attorney did not communicate a plea offer to him. Frye was charged with a felony carrying a maximum term of four years imprisonment. Id. at 1404. The prosecutor in that

case made an alternative plea offer of a felony with 10 days of "shock time" in prison or a misdemeanor with 90 days in prison.  Id.  Frye's attorney never communicated the plea offer to him, and it expired.  Id.  Later, Frye pleaded guilty and was sentenced to three years in prison, far longer than the plea offer.  Id. at 1404-05.  The Court held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Id. at 1408.

In the instant matter, the United States extended to defense counsel a plea offer.  Based upon the representations of Attorney Ivey, the government believes that Defendant has rejected this offer.  The United States respectfully requests that counsel for Defendant be permitted to address, on the record, whether any plea discussions were ever had between counsel and Defendant.

Moreover, the United States respectfully requests that this Honorable Court address the penalties Defendant will face if convicted of the offenses set forth in the Indictment.  A summary of the offenses and the potential penalties for the same are set forth below.

II.     **CHARGES AND EVIDENCE TO BE PRESENTED**

On October 14, 2015, a duly impaneled federal grand jury returned a three count indictment charging Matthew J. King with the following offenses:

Count 1 – Attempted Money Laundering, 18 U.S.C. § 1956(a)(3)(B), up to 20 years in prison, up to $500,000 fine, 3 years of supervised release, $100 special assessment;

Count 2– Money Laundering, 18 U.S.C. § 1956(a)(3)(B), up to 20 years in prison, up to $500,000 fine, 3 years of supervised release, $100 special assessment; and

Count 3 – Money Laundering, 18 U.S.C. § 1956(a)(3)(B), up to 20 years in prison, up to $500,000 fine, 3 years of supervised release, $100 special assessment.

These charges arise from the money laundering activities of Defendant of money he believed to be the drug trafficking proceeds.

MATTHEW J. KING is a licensed practicing attorney in the State of Ohio. At the times set forth in the indictment, KING operated his law practice out of an office located at 1280 West 3rd Street, Cleveland, Ohio. KING was and is currently a solo practitioner.

In early February of 2014, a confidential source (hereinafter "CS 11") approached TFO Dave Carney of the NOLETF and reported that CS 11 had been at Christie's (strip club) on the evening of February 2, 2014. CS 11 reported that he and KING engaged in a conversation. As the conversation continued, CS 11 reported that it became clear to CS 11 that KING was under the impression that CS 11 was a drug trafficker. According to CS 11, KING offered to launder CS 11's drug proceeds. Further, KING advised that if CS 11 decided to engage his services, CS 11 would come to KING's office, at which time CS 11 would need to remove all electronic devices from CS 11's person. During this conversation in early February 2014, CS 11 was not under the direction and control of law enforcement officers. Consequently, this conversation was not audio or video recorded.

Subsequent to reporting this conversation to TFO Carney, arrangements were made to have CS 11 meet with KING again, this time in a controlled setting. Controlled calls and text messages occurred between CS 11 and KING in an effort to arrange these meetings. Meetings between CS 11 and KING occurred on February 4, 2014, February 6, 2014, February 10, 2014,

and February 18, 2014, March 4, 2014, and April 2, 2014.[1] All of these meetings were either audio and/or video recorded.

A. <u>**The February 4, 2014 Meeting**</u>

On Tuesday, February 4, 2014, at approximately 8:18 p.m., CS 11 was transported by a law enforcement officer to 1280 West 3rd Street, Cleveland, Ohio, the law office of MATTHEW J. KING. CS 11 was equipped with an audio recording device. CS 11 knocked on the back door of the office and was permitted entry by KING. During this meeting, KING confirmed that they (KING and CS 11) had discussed matters at Christie's and told CS 11 that he was "involved" with everyone who had been sitting at their table at Christie's the other night and assured CS 11 that he was discreet and that no one would know of their dealing. KING further emphasized that if asked, he would feign ignorance regarding CS 11's exact business activities. KING assured CS 11 that he "like(s) to fly under the radar and keep quiet," and proceeded to explain to CS 11 the method by which KING would launder CS 11's drug proceeds. KING further explained that, "I don't want to know much in the way of details, because the less I know probably the better." CS 11 questioned KING, "What do you mean by that?" KING responded, "It doesn't matter, they can't um, because I'm your lawyer, um they cannot call me to testify against you ever. Um, but at the same time, I want to at least have some sort of plausible deniability on some of this."

KING explained to CS 11 that he was working with several different clients, and stated, "um, I will usually start them up with an s-corp." KING continued, "Most of it trusts, if you want to go that nuts. Um, you got, the ability to create, like, an entertainment type of corporation. You could actually do a c-corp and if you wanted to, but now with Obamacare and

---

[1] There were subsequent meetings between CS 11 and KING that post-date the April 2, 2014 meeting, but are not relevant for purposes of the offenses charged.

all that shit you're running into,  you have employees under the c-corp and I'm gonna have to fucking make sure they have insurance and all that bullshit.  Um, depending on how many you have.  There are benefits to this because you get tax write offs.  I got, um, right now, I'm kinda negotiating with an accountant in Lorain . . .  who's I call . . . is loosely moral."  KING continued, "So I've been trying to uh, set some things up with him.  To have a meeting for, I've got two clients, they really want theirs done . . . so I'm working on their corporations, those can cost, just to file and get them their tax ID number, you're talking a couple hundred bucks to the state and, you know, five hundred to me, if you want just the bare bones minimum.  If you want something that really fucking looks like everything's fucking in order, it'll cost a grand, eleven hundred.  It will have, if you do that though, you'll end up with a meeting minutes book.  You'll end up, uh, with share certificates and shit like that, uh, and so, you can actually really break it down for the accountant.  Now that's the reason I haven't gone full honk is, I want to talk to this accountant and make sure how he wants to proceed.  Because there's a good way to do this, and then what you do is you funnel that money through your corporation to expenses.  Buying cars, whatever, or just creating outward cash flow and inward cash flow that can co-mingle and clean."

     According to KING, he would set up an "S" corporation for CS 11.  KING explained, "So what we do is, we sit down with the accountant, talk about dollar figures.  How much would be coming in, how often and so forth.  And then we talk about different ideas as far was what you can do with that.  Corporations can buy vehicles, corporations can buy property."  KING continued and explained the benefits of a dummy corporation for purposes of laundering money.  According to KING, the corporation would serve as a vehicle by which illicit proceeds would flow into the corporate bank account and "clean" money would flow out of the corporate bank

account. KING explained that the services of the accountant would cost more, but in the long run would likely be worth it, because "at least you're not going to set off any federal bells and whistles."

In discussing the accountant, CS 11 inquired of KING whether he trusted the accountant. KING's response was, "That's why I'm gonna have a couple more sit-downs with him." KING continued, "look he (accountant) doesn't need to know where the money is coming from." KING continued and intimated that he was actively laundering money for other clients as well.

When CS 11 inquired how much it would cost for KING's laundering services, KING replied "a grand" to the accountant initially, and maybe $5,000 to $6,000 total to the accountant. Later in the conversation, KING explained that KING would require an initial $500 fee to begin the paperwork and that KING and CS 11 would figure out at a later time how much KING would be compensated for his money laundering services. KING noted that his normal hourly rate is $200 per hour for out-of-court services, $300-$350 an hour for in-court services, but that he would "put you (CS 11) in at $175." KING concluded that "the better you do, the more business I get."

KING explained that when making deposits of drug proceeds into the bank, you never deposit over $10,000 because of the IRS. KING explained that he attempts to keep all deposits in the "4 ($4,000) range." KING further explained that "I try and keep the number as low as possible. I know it's a pain in the ass . . . takes more time . . .(but) the less heat you get. When you get thirsty, you get sloppy." KING advised caution as to avoid a "federal money laundering" charge. KING represented to CS 11 that he could comfortably launder "20, 30, 40 thousand a month, depending on how you do it and how many different ways you find to deposit." KING also offered to accept the initial amount of money for laundering from CS 11

and deposit it into KING's Interest on Lawyers Trust Account (IOLTA) account for purported services rendered. KING told CS 11 that he could deposit $7,000-$10,000 into his IOLTA account. KING told CS 11 that he would record the deposit as a retainer, that KING would do some work for CS 11, and that the "unused" portion of the retainer would be returned to CS 11 via a check from KING's IOLTA account and "then you're clean." KING also advised that CS 11 needed to stay "low key" and the key is "you don't talk on the phone."

KING then obtained information from CS 11 in order to begin the corporation paperwork, including CS 11's Social Security number, an address that CS 11 wanted to use for the corporation, and who CS 11 wished to designate as the President, CEO, Board of Directors, VP and Secretary of the corporation. KING also advised that a business checking account needed to be established that CS 11 "can run profit-loss" through.

The meeting ended with KING and CS 11 arranging to meet on Friday (February 7) when CS 11 would bring KING $500 to begin the corporate paperwork.

**B.**     **The February 6, 2014 Meeting**

The February 6, 2014, meeting between KING and CS 11 began at the Barley House eatery on W. 6th Street in Cleveland, Ohio. CS 11 was equipped with an audio and video recording device. After leaving the Barley House, KING and CS 11 walked to and entered KING's office. Once inside, KING began completing paperwork to establish a corporation for CS 11. In the portion of the paperwork that required that CS 11 state a purpose for the corporation, KING stated that they could not "say things like to 'launder money'." KING and CS 11 laughed and joked about this. KING recommended an entertainment business, and CS 11 settled on a promotions corporation. While completing the paperwork, KING and CS 11 agreed

that CS 11 would be the only director at this time, and KING stated he would make CS 11 the statutory agent as well.

During the course of the conversation about the paperwork, CS 11 stated to KING that CS 11 would have the last two kilograms of cocaine "moved (sold)" over the weekend and by early the following week, CS 11 would have $30,000 to bring to KING. KING asked, "To clean?" and CS 11 affirmed. KING stated, "Alright, I'm gonna have to figure out where I'm going to put that. I can put it in my IOLTA, to use as a retainer for the corporation, to cover my ass." CS 11 asked KING if CS 11 should put the apartment (the location that would be used for the corporate paperwork) in CS 11's name or the corporation's name. KING advised CS 11 to put it in CS 11's name and then they could write off a portion of the apartment as an office on CS 11's taxes at the end of the year.

As KING was completing the corporate paperwork, CS 11 asked KING why he did not have a receptionist helping him with all of the work. KING stated that he does not trust them and that they have a hard time keeping their mouths shut.

KING agreed to receive $30,000 of drug proceeds within the next week and stated that he would deposit the proceeds into his IOLTA account and subsequently would issue CS 11 a series of checks for smaller amounts from that account. KING further stated that he would draw up a retainer agreement for a one year period with the $30,000. KING stated that he would "bill-off" the corporation paperwork and issue the smaller checks as refunds to get CS 11 the money back.

CS 11 stated the drug trafficking proceeds would continue to come in, and KING advised that it cost money to avoid "these issues," but in the end CS 11 would have "clean money." KING stated that he is still working with an accountant, but if they could not get him, he (KING) knows an attorney in Lakewood, Ohio, that he trusts and that is also an accountant. KING

referred to his attorney/accountant friend as being trustworthy but explained that he has not "gone that deep with him yet." CS 11 suggested bringing the attorney friend out to Christie's Cabaret one night to talk, and KING replied he would rather just bring him to his (KING's) office because it's the "one place I know they can't bug."

KING took CS 11's $500 payment for preparation of the corporation paperwork and issued a receipt for the same. KING and CS 11 agreed on approximately four days to complete the paperwork. KING stated, "I think you and I are going to have a long, prosperous relationship." CS 11 stated, "We better." KING replied, "We better, or we'll be in a shit-load of trouble together."

CS 11 told KING to remember CS 11 was bringing cash next week and KING stated, "That's fine." CS 11 stated KING could count it and KING replied, "That's what we'll have to do, count it out so we know exactly what you've got." KING further stated, "I'm trying to think of what to do 'cause I don't want to put it all on the books either." CS 11 advised KING to figure out what needed to be done and let CS 11 know. KING affirmed. KING and CS 11 agreed to meet early the following week for the purpose of CS 11 bringing cash to KING for KING to deposit into his IOLTA account to be "cleaned."

## C. The February 10, 2014 Meeting

On February 10, 2014, CS 11 made arrangements via text message to meet with KING later in the evening. CS 11 was equipped with audio and video recording equipment. At approximately 8:46 p.m. on that day, CS 11 was transported by a law enforcement officer to KING's office. KING answered the door.

Once inside of KING's office, CS 11 removed $20,000 of purported drug trafficking proceeds from a bag. The cash was to be laundered by KING. While CS 11 was removing the

cash from the bag, KING handed CS 11 a blank check from a U.S. Bank account (#7760) in the name of Matthew J. King, and stated that it was the account that the money was going to be deposited in "slowly." CS 11 explained to KING that the money was arranged in "bands ($1,000 groupings)" and placed it on KING's desk. KING stated, "Ah, a bunch of racks, do we want to count every one of them?" CS 11 suggested counting a random sample and KING replied, "We'll do a random test, the most you're going to be off is maybe twenty bucks so I'm not …" KING completed counting the $20,000 and advised CS 11 that he was going to deposit $4,000 into the IOLTA account the following day (February 11, 2014) around noon, $4,000 on Thursday (February 13, 2014) and then $6,000 on Saturday (February 15, 2014). KING then went on to describe how he was going to structure the deposits in his books, including putting some of the money into the account and listing it as a settlement in order to avoid scrutiny by the Ohio State Bar Association and the IRS. KING stated that he could turn around a portion of the money in approximately two weeks and the remainder in approximately one month.

  KING stated that he needed to get CS 11's corporation up and running so that they could get a bank account for the corporation and begin using it to launder money. CS 11 provided KING with the address to be used for the corporation at that time. KING asked CS 11 to return to the office the following day (February 11, 2014) in order to sign the corporation paperwork.

  KING and CS 11 discussed the address to be used for the corporation and CS 11 described that there were other addresses as well being used as "trap houses (drug houses where the sale of drugs occur)." KING responded, "Yeah, you'll need those, and you don't spend much time there." KING further advised CS 11 that law enforcement may put a tracking device on CS 11's vehicle and that CS 11 needs to check his vehicle periodically by putting it up on a lift. KING described the physical appearance of the tracking device. KING further opined that you

cannot be too paranoid in "this business" and described how if one member of an organization gets arrested that "that's how these things fall apart, somebody close to you gets pinched and then they talk." KING then offered to check various databases on a daily basis to determine whether any of CS 11's associates had been arrested. KING then inquired as to whether any of CS 11's associates had done federal time because time in the federal system stacks up. KING described that a third strike means life in prison and there is a point system. KING stated, "It's funny how someone with that third strike goes from the upstanding guy who goes down the road to that guy who snitches like a motherfucker." KING explained that is why he asked about associates doing federal time because they would be potential problems with snitching. KING also advised CS 11 not to be flashy or have big parties at CS 11's "trap houses."

KING began whispering very low and advised that he was going to clean a "rack ($1,000)" of CS 11's money at the bank, advising the bank that he needed $100 bills instead of $20's. KING explained that laundering $19,000 would look better than laundering $20,000. Finally, KING and CS 11 made arrangements to meet again the following day and have CS 11 sign the corporate paperwork.

D. **The February 18, 2014 Meeting**

At approximately 2:50 p.m. on this date, CS 11 was transported by law enforcement officers to the law office of KING. CS 11 was outfitted with an audio and video recording device. Upon arriving at the building, CS 11 met with a male who also worked in KING's building and CS 11 spoke with him while waiting for KING to return from court.

Upon KING's return, KING escorted CS 11 into his office and took CS 11's cell phone, placing it in his drawer. KING immediately asked CS 11 if he was doing any business with Gilbert Mendez, who at that time was under investigation for drug trafficking, and who KING

represented at the time. KING explained that he had received word from some of the people he knows that law enforcement authorities were "up his (Mendez's) ass." CS 11 assured KING that CS 11 was not in business with Mendez. KING then went on with the conversation.

KING stated that the address CS 11 provided did not save in the corporation document that KING had been drafting the last time they met, so he needed CS 11's address again. CS 11 agreed to provide the address once he was able to look it up again.[2] KING stated that he was going to write CS 11 a check but told CS 11 not to cash it until the following day (February 19, 2014) so that he could make sure that everything was "square" in the account.[3] KING further stated that he was going to date the check for the following date. KING stated that CS 11 had to open a bank account so it may be a while before he could cash the check anyway. KING and CS 11 agreed that the check would be made out to the corporation to keep everything simple.

KING and CS 11 discussed that no one knows they are doing business together. KING stated that his accountant associate who he had referenced in a previous conversation is the only person who knows KING was working on CS 11's money, but that the accountant did not know specifically who he (KING) was working with. KING further stated that he mentioned CS 11's laundering needs to two lawyers he knows to gauge their possible interest in participating. CS 11 asked KING whether he trusted them. KING stated that he did. KING and CS 11 agreed that CS 11 would meet the lawyers prior to working with them.

KING completed the paperwork for the corporation that he was setting up, explained the paperwork to CS 11, and CS 11 signed the same. KING described the corporation as promotions

---

[2] CS 11 had previously represented to KING that he was in the process of moving into a new apartment.

[3] The check provided to CS 11 was a $2,000 check made payable to "M.A.T. & Associates" drawn on the account ending in 7760, as described above.

and entertaining. KING stated that he was going to get CS 11 a binder, some certificates and other materials necessary for maintaining records of the corporation and that it would be "a good looking jerk-off."

### E. The March 4, 2014 Meetings

On the morning of March 4, 2014, CS 11 arrived at KING's office at approximately 9:00 a.m. However, KING was not at the office at that time. CS 11 telephoned KING. KING indicated that he would be back at noon and CS 11 was to meet him at the office then. CS 11 requested a check made out to CS 11 in CS 11's name.

At approximately noon on March 4, 2014, CS 11 returned to KING's office to obtain a check made payable to CS 11 personally. CS 11 was equipped with an audio and video recording device. At that time, KING wrote a check from U.S. Bank account #7760, as described herein, for $2,000 made payable to CS 11. KING told CS 11 that "you could probably deposit it today, and it won't hit my account until tomorrow." KING also told CS 11 that his girlfriend "Viola" (identified, but not indicted) was interested and willing to assist KING in laundering CS 11's drug proceeds. KING told CS 11 that Viola had "laundered" money previously for both her ex-husband and a former employer. KING also indicated that there was an accountant KING was communicating with that was also willing launder CS 11's drug proceeds. KING told CS 11 to return at 8 p.m. that evening for purposes of a meeting with Viola, the accountant, and KING. KING indicated that at that time, they would further discuss how the money laundering would be effected.

At approximately 7 p.m. on March 4, 2014, KING contacted CS 11 and indicated that he needed to cancel the 8 p.m. meeting, as the accountant was out of state and not back until

Thursday or Friday. KING asked of CS 11 whether CS 11 was available on Thursday or Friday for a meeting.

**F. March 5, 2014**

On March 5, 2014, CS 11, accompanied by a law enforcement officer, cashed the check provided by KING on March 4, 2014, and received $1,995. [4]

**G. The April 2, 2014 Meet**

On April 2, 2014, CS 11 was told by law enforcement officers that he was going to deliver $40,000 to KING in order to continue laundering drug money. When CS 11 was picked up by law enforcement officers, he was told that the plan had changed, that the $40,000 money drop was not going to happen. Instead, CS 11 was instructed he was to ask about the $20,000 that had been delivered previously. CS 11 also was to have KING explain why the LLC was not yet set up.

CS 11 was equipped with an audio and video recording device and driven to KING's office. CS 11 entered KING's office and came out a short time later with KING. The two walked to Barley House and ate lunch. After lunch, the two went back to KING's office. During this meeting, CS 11 and KING discussed the role of Viola and how money would be laundered in the future. KING told CS 11 that had CS 11 brought the $40,000, KING was going to make three deposits that day, and then take the money to Viola to make the rest of the deposits.

---

[4] A $5.00 fee was charged by the bank because CS 11 did not have an account at the bank.

### III.  The KING Interview

On April 2, 2014, while a search warrant was executed at his office,[5] KING spoke with investigators.  KING was provided his Miranda warnings and agreed to speak.  KING related the following:

KING admitted that he had laundered money for CS 11.  KING indicated that CS 11 approached him and asked if KING could help CS 11 launder money.  KING admitted that he began making arrangements to set up a system by which CS 11's money could be laundered. KING stated that CS 11 subsequently met with KING on approximately six occasions regarding the money laundering.  KING claimed that much of what he said to CS 11 was "blowing smoke up his ass to make himself seem more in the know."  KING stated that he didn't trust CS 11 and was trying to "feel him out" to find out if CS 11 was legitimate.  KING admitted to accepting the $20,000 in cash from CS 11 stated that he and began giving CS 11 back amounts of the original cash several times a week.  KING stated CS 11 would call KING and ask for $500-$2000 at a time and tell KING to deliver it to the area of the Horseshoe Casino and other locations in the the downtown area to include KING's office.  KING stated that within a couple of weeks of accepting CS 11's money to launder, he had given CS 11 back all but approximately $2300. KING stated he spent some of CS 11's money so he issued CS 11 a check from his IOLTA account for $2,000 and kept $300 for filing fees for the shell corporation KING intended on setting up for CS 11.  At that time KING believed he had returned all of CS 11's money to him.

---

[5] The search warrant was executed after the April 2, 2014, controlled meet, during the late night hours of April 2, 2014, and into the early morning hours of April 3, 2014.

KING also stated that CS 11 contacted him for $100-$200 on occasion.  KING indicated that he loaned CS 11 money.

IV.     **EXHIBIT LIST**

Exhibit 1 – 02/04/14 Audio Recording
Exhibit 2 – 02/06/14 Video Recording
Exhibit 3 – 02/10/14 Video Recording
Exhibit 4 – 02/18/14 Video Recording
Exhibit 5 – 03/04/14 Video Recording
Exhibit 6 – 04/02/14 Video Recording
Exhibit 7 – Receipt
Exhibit 8 – Check # 251
Exhibit 9 – Check #312
Exhibit 10 – Check #313
Exhibit 11 – Bank records

V.      **STIPULATIONS**

There are no stipulations at the present time.

VI.     **ANTICIPATED EVIDENTIARY AND LEGAL ISSUES**

A.      Transcripts

Six audio recordings will be presented by the government at trial.  Some portions of these recordings are faint.  In order to assist the jury in receiving the evidence, transcripts of the relevant portions of the audio have been prepared and will play contemporaneously with the audio.  The government has provided these transcripts to defense counsel, as well as submitted the pertinent pattern jury instruction regarding recordings as an aid in receiving evidence.

B.      Separation of Witnesses; Presence of Government Agent at Trial

The government respectfully requests that the Court issue a separation-of-witness order pursuant to Federal Rule of Evidence 615. The government will designate one law enforcement officer, as its representative in this case to be present at counsel table throughout the trial. His presence in the courtroom during trial is essential to the presentation of the government's case.

<u>See</u> Fed. R. Evid. 615(b) (specifically excluding from a sequestration order "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); Fed. R. Evid. 615(c) (providing an additional exception for essential witnesses).

                Respectfully submitted,

                CAROLE S. RENDON
                Acting United States Attorney

By:    /s/ Michelle M. Baeppler
        Michelle M. Baeppler (OH: 0065378)
        Margaret Sweeney (OH: 0086591)
        Assistant United States Attorneys
        801 W. Superior Ave., Suite 400
        Cleveland, Ohio  44113
        (216) 622-3995 / 3990
        (216) 522-7499 (facsimile)
        Michelle.Baeppler@usdoj.gov
        Margaret.Sweeney@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May 2016, a copy of the foregoing Government's Trial Brief and accompanying exhibit was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

                /s/ Michelle M. Baeppler
                Michelle M. Baeppler
                Assistant U.S. Attorney